TRACY L. WILKISON
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
KAREN I. MEYER (Cal. Bar No. 220554)
Assistant United States Attorney
Violent and Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8559
     Facsimile: (213) 894-3713
     E-mail:   kim.meyer@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>         v.<br><br>PABLO HERNANDEZ,<br><br>     Defendants. | No. CR 15-662-ODW-5<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT HERNANDEZ'S POSITION RE: LOSS<br><br>[EXHIBITS FILED UNDER SEAL]<br><br>Sentencing<br>Date and Time:  January 20, 2021<br>                    11:30 a.m.<br><br>Location:     Courtroom of the<br>              Hon. Otis D.<br>              Wright |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistants United States Attorney Karen I. Meyer and Joseph D. Axelrad, hereby files its Response to Defendant Hernandez's Position Re: Loss.

     This response is based upon the attached memorandum of points and authorities, the files and records in this case, and such further

evidence and argument as the Court may permit.

Dated: January 19, 2021          Respectfully submitted,

                                 TRACY L. WILKISON
                                 Acting United States Attorney

                                 BRANDON D. FOX
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                 _____
                                 KAREN I. MEYER
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.   FACTS

3    Defendant and co-defendant Emilio Herrera ("Herrera") sought to
4 hire a confidential source ("CS1") to help them launder for a fee
5 millions of dollars in their clients' cash from Mexico (and
6 elsewhere) to the United States and back. (See 1D80 at 18-19, 22,
7 53, attached hereto as Exhibit ("Ex.") A); (1D107 at 20, attached
8 hereto as Ex. B) (in April 2012, defendant called CS1 and stated that
9 he had friends who were ready to start, and proposed that CS1 pick up
10 cash in Phoenix, Arizona; Kansas; and elsewhere for transfer to
11 Mexico); (Ex. B, 1D107 at 24) (defendant told CS1 that he had a
12 person in Canada who wanted to deposit funds in CS1's account in Los
13 Angeles and that CS1 could then send the money back to Mexico for
14 defendant); (1D101 at 10-11, attached hereto as Ex. C) (in January
15 2012, defendant called CS1 to say that his people had $300,000 in
16 cash to be sent into Guadalajara, and asked if CS1 could handle this
17 transaction.) Defendant and co-defendant Herrera sought CS1's help
18 because banks would ask for the source of the cash while CS1 would
19 not. (See Ex. A, 1D80 at 23) (defendant and co-defendant Lu
20 explaining that banks would ask about the origins of the cash
21 deposits, while CS1 would not). In fact, co-defendant Herrera was
22 using his own bank accounts in the United States to launder cash
23 until they were systematically shut down. (See Ex. F, 1D121 at 25)
24 (co-defendant Herrera stating that he was already laundering money
25 through his personal bank accounts but that Chase Bank, Wells Fargo
26 Bank, and U.S. Bank were closing his accounts).
27    The laundering would be done either by money laundering
28 transactions with cash provided by defendant and co-defendant

Herrera, or by defendant and co-defendant Herrera trying to buy a
bank, including Saigon National Bank. (See 1D105 at 17-18, attached
hereto as Ex. D) (in March 2012, defendant stated that the amount to
be transferred was as much as $3 million and that the transactions
would occur monthly); (Ex. A, 1D80 at 24) (in August 2011, defendant
told CS1 that cash had been delivered to Saigon National Bank, but
that defendant was looking for an additional bank where he could
deposit up to $3 million to $5 million each day in cash that could
then be wired back to Mexico); (1D109 at 27-29, attached hereto as
Ex. E) (in May 2012, defendant called CS1 and said that he had a
different group of friends who wanted to send $600,000 from Mexico
City to a bank account in Hong Kong, and that they wanted to repeat
this transaction every three weeks); (1D121 at 26, attached hereto as
Ex. F) (in August 2012, defendant said that after the closure of the
Saigon National Bank account where they had tried to launder money,
they had tried to buy Saigon National Bank). Defendant said that the
purpose for his clients buying Saigon National Bank was to clean or
launder money. (See 1D93 at 13).

Two principal meetings occurred a year apart between defendant,
co-defendant Herrera, and co-defendant Lu, the former CEO of Saigon
National Bank - in August 2011 and August 2012. In addition,
defendant had meetings with CS1 himself, and with a second
confidential source ("CS2") in which defendant admitted to
connections to the Sinaloa Cartel and laundering money for the
cartel. (See 1D179 at 13) (in September 2014, defendant told CS2
that the people from Sinaloa are Chapo's people, that they had $300
million they wanted to launder, and that defendant had asked them for

a 3 percent commission for laundering money, which they said was no problem.)  Defendant also had phone calls with CS1 to discuss money laundering transactions.  In these meetings and phone conversations, details of the amount of money to be laundered, the fees that CS1 would demand and the fees that defendant and his co-defendant would receive from their clients were discussed.  (See Ex. A, 1D80 at 64-65) (in August 2011, CS1 told defendant that CS1 wanted to limit their first deal to $1 million, and defendant asked how long it would take for CS1 to consider doing deals amounting to more than $1 million); (Ex. F, 1D121 at 6-7, 20-21) (in August 2012, defendant asked CS1 if CS1 could receive $500,000 every day and deliver that amount to Tijuana the same day.  Defendant discussed how the fees that his clients paid would be split among him, co-defendant Herrera and CS1.  Co-defendant Herrera told defendant, co-defendant Lu, and CS1 that the amount of money they were discussing was $10 million every month); (See Ex. F, 1D121 at 87, 98, 108) (in August 2012, defendant told CS1 that once their people begin working with CS1, he would not need any other business because the money CS1 would be handling would amount to more than $10 million each week.  Defendant wanted CS1 to reduce his money laundering fee by 1 percent so that defendant and co-defendant Herrera could split the remaining 1 percent.)  Defendant and co-defendant confirmed that if anything happened to the cash that was delivered to CS1 to launder, CS1 would "disappear."  (See Ex. F, 1D121 at 81) (in August 2012, co-defendant Herrera said that he had been bringing $3 million over from Mexico

every day, and defendant agreed that if something happened to the three million, CS1 would disappear.).[1]

Despite this evidence, and the fact that defendant stipulated in his plea agreement to a +4 levels for being in the business of laundering funds, defendant disputes the government's $7 million loss calculation (and the consequent +18 levels under the guidelines for loss) associated with the laundering of $2 million in cash through Saigon National Bank in July 2011 by a company (Credes) with which he and co-defendant Herrera were affiliated, either claiming to own or claiming it to be owned by their clients, and the $5 million associated with the offer to buy shares in Saigon National Bank, which co-defendant Herrera stated would be used to continue their money laundering activities.  Despite being in the business of laundering funds, defendant erroneously contends that he should not receive any enhancement for the value of laundered funds, stating that the government has failed to prove by any standard (either clear and convincing or preponderance of the evidence) $7 million in loss.[2]

---

[1] (See also Ex. A, 1D80 at 29) (at a meeting in August 2011, while co-defendant Lu and CS1 were conversing in Cantonese, defendant told co-defendant Herrera in Spanish that CS1 wanted to know more than he could be told); (1D93 at 6) (in October 2011, CS1 asked defendant what kind of money they were handling, and defendant responded that he did not want to ask many questions of these guys.).

[2] Defendant asserts that the government bears the burden of establishing loss by the clear and convincing evidence standard. (Deft.'s Loss Response, at 3.)  This is not clear.  United States v. Hyman, 780 F.3d 1285 (9th Cir. 2015).  "Our precedents have not been a model of clarity in deciding what analytical framework to employ when determining whether a disproportionate effect on sentencing may require the application of a heightened standard of proof...We have also held that there is no bright-line rule for the disproportionate-impact test; instead the court uses the totality of circumstances using six factors...."  Hyman, 780 F.3d at 1289-90 (citations and internal quotation marks omitted).  "But the size of the loss enhancement, standing alone, does not compel the use of the clear and

4

(Deft.'s Loss Response, at 2-3).  Specifically, defendant contends that the government's evidence does not exist, or if it does, is not reliable.  (Id. at 3.)  It is hard to imagine what would be more reliable than defendant's own words – words that demonstrate that defendant sought to hire CS1 to launder millions of dollars in drug trafficking cash for his clients, including the Sinaloa Cartel, words that are buttressed by bank records showing over $2 million in cash laundered through an account at Saigon National Bank in July 2011 until that account was shut down, words that are corroborated by statements by co-conspirators, and words that are supported by defendant's own stipulation that he was "in the business" of laundering funds.  Specifically, as the government noted in its sentencing position through transcript references and bank records, Credes laundered over $2 million in cash in July 2011 through an account at Saigon National Bank that it opened the month before. That account was closed two months later, in August 2011. (Credes statement at Saigon National Bank for September 2011, attached hereto as Ex. I.)  Co-defendant Lu, former CEO of Saigon National Bank, stated that he had been told by the CFO to freeze the account after the $2 million in cash had been deposited in the account, and that he was afraid of a government audit.  (See Ex. A, 1D80 at 99-100) (defendant and co-defendant Lu acknowledged that co-conspirators did not listen to co-defendant Lu when they deposited the $2 million at Saigon National Bank while co-defendant Lu was on vacation and, as a result, got their account closed); (1D79 at 77-78) (co-defendant Lu

_____

convincing standard."  Id. at 1291.  Regardless, the evidence of the value of laundered funds and its corroboration satisfies either standard.

states that while he was on vacation in Cambodia, Saigon National Bank's CFO tagged an account with being a money laundering account, and Lu was told by his director to freeze the account, making it hard for the "people in Mexico" to deposit $1 million a day).

## II.   U.S.S.G. §§ 2S1.1 AND 2B1.1

Section 2S1.1(a)(2) of the guidelines calculates the base offense level as 8, coupled with the loss calculation from Guideline § 2B1.1 "corresponding to the value of the laundered funds." U.S.S.G. § 2S1.1(a)(2).   See also U.S.S.G. § 2B1.1, cmt., n.3(A) and n.3(C) ("loss is the greater of actual loss or intended loss... [and] [t]he court need only make a reasonable estimate of the loss.   The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.").   "Laundered funds" are defined as "the property, funds or monetary instrument involved in the transaction, financial transaction, monetary transaction, transportation, transfer, or transmission in violation of 18 U.S.C. § 1956...".   U.S.S.G. § 2S1.1, cmt., n.1.   Under this definition, the $2 million in cash that defendant and co-defendant Herrera helped launder through the Credes account at Saigon National Bank[3] and the

---

[3] As noted in the government's sentencing position paper, defendant stated that he was involved in laundering the cash through the Credes account at Saigon National Bank until that account was shut down, at which point they decided to try to buy the bank to continue their activities.   (See Ex. F, 1D121 at 26) ("PH [Hernandez]: We aren't going to try ourselves nothing. That's why we want to hire you to do it.   With your company and uh—then the way that you know how to do it. CHS: Yes. PH: We tried to do it with your uncle [LU], but then they cancelled that account.   Then we tried to— to—to uh--buy the bank, but then all of a sudden this guy fucked up.") (emphasis added).

6

$5 million offer to buy shares in Saigon National Bank to facilitate defendant and co-defendant Herrera's money laundering activities constitutes property involved in the transaction, transportation, transfer, or transmission in violation of the money laundering statute, 18 U.S.C. § 1956.[4]

Ignoring the phrase "value of laundered funds" found in the applicable guideline, defendant focuses instead on the definition of "pecuniary harm" as a component of loss found in U.S.S.G. § 2B1.1, contending that the $5 million offer to buy Saigon National Bank cannot so qualify. The government disagrees. The definition of "pecuniary harm" under § 2B1.1 certainly includes the value of the shares of the bank sought to be purchased:

(ii) Intended Loss – "Intended loss" (i) means the pecuniary harm that the defendant purposely sought to inflict; and (ii) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value.").

(iii) Pecuniary Harm.—"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money....

U.S.S.G. § 2B1.1, cmt. n.3(A)(ii), (iii).

This is made most clear by the factors set forth in the application note regarding how to estimate loss. U.S.S.G. § 2B1.1, cmt. n.3(C) ("The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following..."). The

---

[4] As the cross reference to loss (both actual and intended) in U.S.S.G. § 2B1.1 makes clear, whether the transaction actually occurred is irrelevant, although in the case of the $2 million laundered cash the transactions did take place.

7

first factor is "[t]he fair market value of the property unlawfully taken, copied or destroyed...." U.S.S.G. § 2B1.1, cmt. n.3(C)(i). In this case, defendant and co-defendant made clear since the Credes account at Saigon National Bank was closed in 2011, and co-defendant Herrera's bank accounts were systematically closed, their intent to buy a bank, including Saigon National Bank, to continue laundering drug money on behalf of their clients, satisfying the purposeful infliction of pecuniary harm.  And as the Ninth Circuit made clear in the Smith case cited by defendant, "[a] district court need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information...." United States v. Smith, 729 F. App'x 517, 518 (9th Cir. 2018) (citation and internal quotation marks omitted).  Thus, under both guideline application notes, the $5 million offer to buy shares of Saigon National Bank is information that is readily quantifiable that this Court may, and should, consider.

The same is also true for the over $2 million in cash that was laundered through the Credes account at Saigon National Bank.  As noted above, defendant through his own words linked himself to Credes and the actual laundering of the $2 million in cash. (See Ex. F, 1D121 at 26) ("PH: We aren't going to try ourselves nothing. That's why we want to hire you to do it.  With your company and uh—then the way that you know how to do it. CHS: Yes. PH: We tried to do it with your uncle [LU], but then they cancelled that account.) (emphasis added).  In disputing this fact, defendant contends that his plea

8

agreement establishes his "first participation date" as August 25, 2011.  This is incorrect, and is refuted by two statements contained in defendant's factual basis, specifically, (1) that defendant was a member or associate of a criminal enterprise "[b]eginning on a date unknown," and as a member or associate of that enterprise, agreed with co-defendants to "participate in the affairs of the criminal enterprise through a pattern of crimes including money laundering;" (CR 617, Plea Agmt, at 6) and (2) "[d]efendant told CS1 that they had already tried to launder money with an account at Saigon National Bank but that that the account had been closed."  (CR 617, Plea Agmt, at 7.)  Defendant's stipulations support the $2 million in cash as part of the "value of laundered funds."

**III. CONCLUSION**

Defendant's position that no loss should be attributed to the RICO conspiracy in which defendant participated has no support, while in contrast, the government's loss calculations of $7 million (and consequent enhancement of +18 levels) are corroborated by defendant's own statements, statements of co-defendants, bank records, and the stipulations and facts contained in defendant's plea agreement.

The government recommends an 84-month custodial sentence, followed by a three-year period of supervised release, and a $100 special assessment.